**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

GUARDANT HEALTH, INC.,

Plaintiff,

v.

FOUNDATION MEDICINE, INC.,

Defendant.

C.A. No. 17-1616-LPS-CJB

**MEMORANDUM ORDER**

This patent infringement suit between competitors – Guardant Health, Inc ("Guardant" or "Plaintiff") and Defendant Foundation Medicine, Inc. ("FMI" or "Defendant") – has been vigorously litigated for three years. Most recently, the Court has considered whether to proceed with a jury trial that had been scheduled to commence this month, notwithstanding the ongoing challenges imposed by the impact of the global coronavirus pandemic and FMI's objections; a substantial motion alleging spoliation by Plaintiff's co-founder and Chief Executive Officer and whether fully and fairly litigating that motion precludes holding trial any time soon; and Defendant's renewed *Daubert* motion directed at two of Guardant's expert witnesses. Each of these issues is addressed in the instant Order.

**The Court Overruled FMI's Coronavirus-Related Objections To A November 2020 Trial**

Prior to the pandemic, a jury trial in this case was scheduled to begin on May 18, 2020. (D.I. 24) By agreement of the parties, that date was rescheduled to early November 2020. (D.I. 394) Due to the pandemic, however, jury trials in this District were cancelled from mid-March

through September 15, 2020, creating a significant backlog in scheduling trials.[1] Between September 25, 2020 and October 29, 2020, the Court ordered and received multiple submissions from the parties, and had several discussions with the parties, relating to scheduling, and ultimately reset trial to begin on November 30, 2020. (*See* D.I. 471, 473, 475, 480, 487-88, 498-99) In doing so, the Court carefully considered FMI's continuing objections to trial being held any time before 2021.

As the Court explained during an October 29 teleconference, the Court was not persuaded by FMI's coronavirus-related objections to conducting a jury trial in November 2020, stating as follows:

> Let me turn to the question of the November 30th trial and FMI's objections . . . .
>
> . . . I will continue to be looking carefully at these issues as we move forward in whatever form we move forward.
>
> . . . I'm thinking about them in connection with many other cases at the same time and also in my administrative role for the Court. So every day, I'm getting more and more information about the situation in Delaware, the situation elsewhere, and more and more information, I'm happy to say, about how other courts are proceeding with trials, notwithstanding the challenges we're all facing. So the first thing I wanted to say [is] I do recognize the risk. . . . I don't mean to minimize any of the concerns that have been raised, but I do, recognizing all that, continue to believe that this trial can be conducted safely and fairly here in Delaware starting on November 30th consistent with the restrictions and the guidelines that I have explained that we will follow and subject to further ongoing discussions with all of you.
>
> And, of course, I will continue to evaluate conditions as they evolve. In Delaware here, as best as we can tell, it seems that the coronavirus numbers are fairly steady. Some days we see an increase, some days we see a decrease . . . . [I]t certainly does not yet appear in the data that things are rapidly deteriorating in Delaware. Were that to happen, I certainly would have to reconsider my approach.
>
> I have provided for this trial for remote participation . . . for all of the witnesses, but also up to all but one counsel on each side can participate remotely as well. I

---

[1] *See* Standing Order RE: Criminal and Civil Jury Selections; Jury Trials; and Transition to Phase 2, COVID-19 Page, District of Del. (Sept. 1, 2020), https://www.ded.uscourts.gov/node/76557; Phase 2 Announcement, COVID-19 Page, District of Del. (Sept. 15, 2020), https://www.ded.uscourts.gov/node/76557.

placed a limit of five folks per side in the courtroom at any one time . . . . [T]hat is a ceiling, it's not a floor. I do want you to have at least one person in the courtroom. But I think you could, you could do this trial with one person in the courtroom and everyone else can participate remotely. Part of the reasoning of that was I recognize that at least one side is telling me that they have half . . . of their trial team that feels it would not be wise for them to travel to Delaware November 30th. Part of my thinking was, well, . . . that is fine if that is your decision. You can participate fully, entirely and effectively from wherever it is you are safe through the remote technology, or alternatively I have given you enough time. You can find somebody else to do your part of the trial. I do not want, and in going forward with this trial, I'm not trying to create any requirement for someone to risk their health by coming to Delaware for their trial. You don't need to come to Delaware for this trial.

Further, the suggestion in one of FMI's filings [is] that you are going to have to spend lots of time together with other members of the trial team without preserving social distance, . . . in a way that is going to endanger your health or the health of others[.] I just don't understand that. You can prepare for this trial remotely. . . . You can use large rooms where you maintain . . . social distancing and wear masks. Obviously, we're all learning to do almost everything through remote technology. And I see no reason to think that you cannot, as trial teams, prepare for this trial while still keeping a safe and healthy distance from one another, either in the same room or in different rooms potentially all over the country.

I will be explaining to this jury in great detail the protections and the precautions that we are undertaking and how this trial will look different than trials would have looked pre-pandemic. I'll explain, of course, that no witnesses will be in the courtroom and that many attorneys will not be in the courtroom as well. I will explain that these are decisions that I have made, that I have determined are in the best interest of all of us to protect our health and safety and most especially theirs, that is, the jury's. I will do everything I can to encourage them not to blame any of you for that situation or to hold it against anybody. And I strongly believe the jury will comply with that instruction. I see no reason to think that the jury is going to somehow hold the precautions that I'm putting in place against FMI and hurt them or punish them for it. I think those suspicions are just unwarranted.

[M]any courts around the country have resumed conducting trials, including complex trials, including patent jury trials. I talked to several judges who have presided over these. . . . The general reports are very good. I just believe that we can do this here [in] Delaware, just as other courts have found a way to do it.

. . . . I recognize that there are some troubling predictions about what direction this pandemic may be headed in, but if that turns out to be right and we're living with this pandemic for another year or more or who knows, that just to me means as long as it can be done . . . protecting health and safety, which I think it can, . . . I need to move forward with a jury trial . . . . [I]f this one is ready for trial on November 30th, then it should go forward on November 30th.

> As you may know, I plan to be in a criminal jury trial starting on November 16th, two weeks before this trial. . . .[[2]] We're also, as a District, proceeding in the near future with selecting a new Grand Jury, and other courts have successfully done the same. These events . . . require many more people in the courthouse than your civil jury is going to require. If, as I fully expect, we can safely do a criminal jury trial where we will have at least 14 jurors and a very large jury pool, and a Grand Jury is even larger than that. . . . [i]f we can do those safely, then we can do your civil jury trial safely.
>
> Notably, at the criminal trial that I have coming up on November 16th, I'm having some witnesses testify remotely. I continue to believe that juries, just like the Court, . . . can fully and fairly evaluate credibility when witnesses testify live but remotely. . . . [S]o I continue not to find persuasive FMI's objections on those grounds.
>
> . . . . I believe we will be able to select a representative jury and that we will not have to bring an inordinate number of jurors into the courthouse. I believe we will be able to do that largely through using a COVID jury questionnaire which I had my deputy share with you . . . . And by having further conversations over the course of the next 30 days or so where I think we'll be able to see how the jury pool is shaping up, I think we will be able to agree on many of the potential jurors that can be stricken based on their COVID responses. And I think we will be able to safely impanel a representative jury.
>
> If I'm wrong, then one or both sides will object and I will deal with the objections, but those are not bas[es] to not go forward. So in terms of the objections to the trial based on COVID, those objections are again overruled. If you want to keep raising them, you can keep raising them. I have invited you to do that and I'm not in any way faulting you. Things could change quickly. But I think I have been clear about my feeling about the arguments that have been raised.

(Oct. 29, 2020 transcript (D.I. 503) at 75-83)

**The Court Continued Trial To Allow Full And Fair Consideration Of FMI's Sanctions Motion**

Although the Court overruled FMI's COVID-related objections, the Court ultimately determined it had to continue trial indefinitely in order to allow the parties a full and fair

[2] As it happened, jury selection in the criminal matter (*United States v. Aaron Davis*, 19-cr-101-LPS) took place on November 16, 2020. At the end of the day, the Court granted Defendant's motion for a continuance. (*See* D.I. 81) On that same day, the Chief Justice of the Delaware Supreme Court announced that the Delaware state courts were returning to a phase of their Reopening Plan (Phase 2) in which jury trials will not occur. *See* "Delaware Courts pause jury trials in response to increasing COVID 19 cases" (Nov. 16, 2020) (available at *https://courts.delaware.gov/forms/download.aspx?id=124808*).

opportunity to litigate FMI's very serious spoliation allegations and permit the Court to carefully consider what, if any, sanctions are warranted. The Court explained this decision during a teleconference with the parties on November 2, after hearing argument (for a second time) on the pending motion:

> First, and most importantly, at least most pressingly, reluctantly but I think necessarily under the circumstances as they have developed with respect to FMI's spoliation motion, I have now decided that I have to continue the trial. We're not going to have a trial on November 30th. I'm going to continue that trial to a date to be determined, and it's a date that I am not going to set at this time. I'm not even going to set it until after I have ruled on the spoliation motion and determine what the appropriate sanctions, if any, are to impose on Guardant as a result of the sanctions motion.
>
> It is regrettable. I'm doing it reluctantly. This was going to be my first patent jury trial since March. And I do want to emphasize that my decision to continue this trial is not COVID related as we discussed last week.
>
> . . . . I have in front of me . . . a very serious spoliation motion. And with the pendency of that motion, it would not be right to rush to trial four weeks from today. . . .
>
> The subsequent argument and new evidence that was submitted by Guardant last night does raise the prospect that I might ultimately deny the spoliation motion . . . . [A]lternatively I might grant the motion but only impose monetary sanctions which would not themselves impact a trial on the merits. But the important point to me in deciding whether to go forward with the trial in four weeks is I am today not in a position to rule out all sanctions that could impact the trial.
>
> So to be a little bit precise, I am not today in a position to rule out the possibility that the pending motion may result in me granting an adverse inference instruction and/or the possibility of expert testimony regarding spoliation. And as long as I can't rule [out] those possibilities, it seems obvious that rushing forward to a trial that may be impacted by my ultimate decision, a decision I'm not ready to make, doesn't make any sense. And I'm not going to rush into deciding this motion, which again I continue to view as a very serious motion.
>
> . . . . [Also,] I do not feel comfortable making a factual finding as to [CEO] Dr. Eltoukhy's intent, that is, whether he acted in bad faith or not, without seeing him testify live in front of me, presumably by remote technology. And it's going to take time for you all to get ready for that and to schedule it. . . . I'll note that Guardant said, at page 9 of last night's status report [D.I. 504], "If the Court reaches the question of Dr. Eltoukhy's intent notwithstanding the above showing . . ., we

request an oral hearing on the subject at which Dr. Eltoukhy may address the issue."[[3]]

. . . . I do not feel comfortable making a factual finding as to Dr. Eltoukhy's intent without considering the evidence that Guardant added to the record only last night. Even if I were to view that evidence as untimely, it is evidence. I've now seen it, and it might impact the decision, and I'm not prepared to rule out the possibility that it would impact the decision. . . . So I'm not persuaded to strike the new evidence.

But at the same time, I don't feel comfortable considering the new evidence without giving FMI an opportunity to take further discovery relating to it and . . . FMI figuring out how it wants to deal with the new evidence . . . .

Additionally, I don't view this motion as about just April 2019. I think it is October 2019 as well, which is arguably a second round of spoliation by Dr. Eltoukhy. . . .

And if all that was deleted in October 2019 can be recovered, if only I give a little bit more time, . . . well, I'm not today ready to rule out the possibility that that is what should occur.

. . . . Again, this is very serious. It's possible when I see Dr. Eltoukhy testify and the discovery is finished, I will be persuaded that he was acting in good faith the whole time. But the contrary is also possible. And I think that the best way forward that is fairest to all of you and to me is to try to get to the bottom of what really happened, and that is going to take some more process and some more time.

(Nov. 2, 2020 transcript (D.I. 505) at 37-47)

**Spoliation-Related Discovery, An Evidentiary Hearing, And Further Briefing Are Required Before The Court Can Resolve The Sanctions Motion**

After continuing trial, the Court provided the parties an opportunity to present their focused proposals for how the Court should proceed with respect to the sanctions motion. Having considered this input (D.I. 507), the Court has decided as follows:

- FMI's forensic images requests 1(a) and 1(b) are GRANTED but request 1(c) is DENIED (the requested access to a back-up of Dr. Eltoukhy's computer that is closest in time to the date of suit in November 2017 is overbroad)

[3] The parties filed a 19-page single-spaced joint status report on Sunday, November 1. (D.I. 502)

- FMI's request 2, for production of all 298 emails that were previously identified as bodiless even if they did not hit on search terms the parties agreed on before FMI learned of Dr. Eltoukhy's deletion of evidence, is GRANTED (Dr. Eltoukhy's selective deletion of these emails makes them relevant at least to the sanctions motion, even if they do not hit on the previously-agreed search terms)[4]
- FMI's request 3, for production of essentially all 4000-5000 pre-2013 emails, is DENIED, other than that Guardant shall comply with its proposed (reasonable) compromise to "produce any of the bodiless emails that are not present on the March 2019 backup regardless of whether they hit search terms" and to search for "other copies of bodiless emails that could not be restored" (D.I. 507 at 2)
- FMI's request 4, for depositions and interrogatories, is GRANTED, as such additional discovery is reasonable and warranted to ensure that FMI has a full and fair opportunity to present the Court an appropriate record on which to determine if spoliation occurred and, if so, what sanctions should be imposed
- Guardant shall further "produce[] all non-privileged files that can be recovered" responsive to "the list of 389 files FMI identified as deleted in October 2019" (*id.*).

The parties will be ordered to meet and confer and propose a schedule for completing this discovery and then conducting an evidentiary hearing on the sanctions motion.

**FMI's *Daubert* Motion Is Denied**

On December 10, 2019, FMI filed a *Daubert* motion to exclude the royalty opinions of Guardant's experts, Drs. Cooper and Becker. (D.I. 300) On April 22, 2020, Magistrate Judge

---

[4] Guardant shall produce a log describing any of the emails that it seeks to withhold as privileged.

Burke issued a Report & Recommendation (D.I. 419) finding these experts' analyses insufficiently reliable and granting FMI's motion while providing leave for Guardant to serve supplemental expert reports. On May 6, 2020, Guardant served Dr. Becker's and Dr. Cooper's supplemental expert reports. (D.I. 429) On July 30, 2020, FMI filed a further *Daubert* motion to exclude the opinions expressed in these supplemental reports. (D.I. 453) The motion is fully briefed (D.I. 454, 461, 463) and was argued during a teleconference on October 29, 2020 (D.I. 503). For the reasons stated below, FMI's motion is DENIED.[5]

FMI argues that Drs. Becker and Cooper both fail to "apportion the commercial value of the conventional steps in FMI's workflow as compared to the steps that Guardant asserts distinguish the method from what was known in the art and covered by its patents." (D.I. 454 at 1-2) Guardant responds that Drs. Becker and Cooper reasonably apportioned value to the patents by mapping patent claims onto FMI's process and then calculating the relative addition of those claims to the overall process. (D.I. 461 at 3-5) The Court agrees with Guardant that its experts' analyses are sufficiently reliable that they could be accepted by a reasonable jury and that FMI's criticisms go to the weight and not admissibility of the challenged expert evidence.

---

[5] Federal Rule of Evidence 702 creates a "gatekeeping role for the [trial] judge" to "ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). There are three distinct requirements for admissible expert testimony: (1) the expert must be qualified, (2) the opinion must be reliable, and (3) the opinion must relate to the facts. *See generally Elcock v. Kmart Corp.*, 233 F.3d 734, 741-46 (3d Cir. 2000). Hence, expert testimony is admissible if it "is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Rule 702 embodies a "liberal policy of admissibility." *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008) (internal citations omitted). Motions to exclude evidence are committed to the Court's discretion. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir. 1994).

When assessing Daubert challenges for royalty rates in multi-component products, apportionment is required. "[T]he ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *see also Mentor Graphics v. EVE–USA*, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (order denying rehearing en banc) ("[W]here an infringing product is a multi-component product with patented and unpatented components, apportionment is required."); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."). In such cases, the patentee must "give evidence tending to separate or apportion the [infringer]'s profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). A reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," although "a trier of fact must have some factual basis for a determination of a reasonable royalty." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[W]e note that we have never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty.")

Dr. Cooper, a technical expert, divided FMI's workflow process into 16 steps and then determined which of those steps are covered by a Guardant patent claim, ultimately according six of them value, an estimate he describes as "conservative[]." (D.I. 454 Ex. 4 ¶¶ 24-26) In doing so, Dr. Cooper relied on a description by FMI's expert, Dr. Metzger, as well as FMI

documents. (*See, e.g.*, *id.* ¶ 24 (citing Dr. Metzger's Rebuttal Report at ¶¶ 77-85; Clark publication))

Dr. Becker, who is Guardant's damages expert, relies on Dr. Cooper's technical analysis. FMI's criticism of this reliance fails for the same reasons its direct attack on Dr. Cooper's analysis fails. The Court further rejects FMI's additional criticism that Dr. Becker failed to place Dr. Cooper's analysis in context of the overall market for cancer diagnostics. (D.I. 454 at 9-11) Dr. Becker considered economic indicators including the relative success of companies employing conventional, prior-art based approaches to cancer testing and diagnostics. (*Id.* Ex. 3 ¶ 10) He then contrasted that success with companies employing non-conventional processes that included features attributable to the patents-in-suit. (*Id.*) In comparing the two, he determined that market success was contingent upon use of patented, non-conventional features. (*Id.*) This analysis sufficiently fits the facts of this case to withstand FMI's *Daubert* challenge. FMI's criticisms go to the weight but not the admissibility of Dr. Cooper and Becker's opinions.

Dr. Cooper's and Dr. Becker's analyses are similar to those that have been found acceptable in other cases, including in decisions by the Federal Circuit. *See, e.g.*, *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1312-13 (Fed. Cir. 2018) (finding jury could credit apportionment analysis in which expert utilized diagram with 24 boxes representing different parts of accused product, accorded equal value to each box, and then opined that damages should be awarded based on boxes which corresponded to elements of asserted claims); *see also Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 218 F. Supp. 3d 375, 389-90 (E.D. Pa. 2016) (equal-weight apportionment of steps not unreliable).

Thus, again, FMI's *Daubert* motion will be denied.

**Conclusion**

Accordingly, for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Trial in this matter is **CONTINUED** to a date to be determined, a date that will not be set until after the Court resolves FMI's pending motion for sanctions based on spoliation.

2. The parties shall meet and confer and, no later than **November 19, 2020**, submit a proposed order setting out the details and timing for completion of the spoliation-related discovery ordered by the Court, as well as a proposed range of dates for a one-day remote evidentiary hearing relating to the motion, and page limits and timing for post-hearing briefs.

3. FMI's *Daubert* motion (D.I. 300) is **DENIED**.

November 17, 2020
Wilmington, Delaware

HONORABLE LEONARD P. STARK
UNITED STATES DISTRICT JUDGE