# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GUARDANT HEALTH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 17-1616 (LPS) (CJB) |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| FOUNDATION MEDICINE, INC., | ) | |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

**DEFENDANT FOUNDATION MEDICINE, INC.'S AMENDED ANSWER
TO PLAINTIFF'S THIRD AMENDED COMPLAINT AND COUNTERCLAIMS**

Defendant Foundation Medicine, Inc. ("Foundation Medicine" or "Defendant") hereby submits its amended answer and counterclaims to the Third Amended Complaint, dated May 7, 2019, filed by Plaintiff Guardant Health, Inc. ("Guardant" or "Plaintiff"). Foundation Medicine denies any allegation not specifically admitted herein.

**NATURE OF THE ACTION[1]**

1.     Foundation Medicine admits that the Third Amended Complaint purports to state a cause of action for patent infringement under Title 35 of the United States Code. Defendant denies that it has infringed any valid and enforceable claims of the patents asserted in the Third Amended Complaint.

2.     Foundation Medicine admits that the Third Amended Complaint purports to state a cause of action under 35 U.S.C. § 1, et seq. Defendant further admits that copies of U.S. Patent Nos. 9,598,731 ("the '731 patent"), 9,834,822 ("the '822 patent"), 9,840,743 ("the '743 patent"), and 9,902,992 ("the '992 patent") are attached to the Third Amended Complaint as Exhibits 1, 2, 3, and 4 respectively. Defendant denies the remaining allegations of Paragraph 2 of the Third

---

[1] Headings from the Third Amended Complaint are included for convenience, but are not allegations to which a response is required.

Amended Complaint, denies that it has infringed any valid and enforceable claim of the '731,'822,'743, and '992 patents, and denies that Guardant has rights to assert those patents against Foundation Medicine.

## PARTIES

1.      Foundation Medicine is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 1[2] of the Third Amended Complaint, and therefore denies those allegations.

2.      Foundation Medicine is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 2 of the Third Amended Complaint, and therefore denies those allegations.

3.      Foundation Medicine is without information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 3 of the Third Amended Complaint, and therefore denies those allegations.

4.      Foundation Medicine admits that it is incorporated under the laws of the State of Delaware, and that it maintains its principal place of business at 150 Second Street, Cambridge, MA 02141.  Foundation Medicine further admits that it markets and sells a liquid biopsy product known as FoundationACT®.  Foundation Medicine admits that it performs FoundationACT® at its facility in Cambridge, MA.

## JURISDICTION AND VENUE

5.      Paragraph 5 of the Third Amended Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Foundation Medicine admits that the

---

[2] Guardant's Third Amended Complaint contains two paragraphs numbered 1 and two paragraphs numbered 2.  This paragraph in Foundation Medicine's Amended Answer and Counterclaims and the ones that follow correspond to the numbered paragraphs beginning at the bottom of p. 1 in Guardant's Third Amended Complaint.

Third Amended Complaint purports to assert an action under the patent laws of the United States, but denies that the claim has any merit.

6.      Paragraph 6 of the Third Amended Complaint states a legal conclusion to which no response is required.

7.      Foundation Medicine admits that it is incorporated under the laws of the State of Delaware.  The remainder of Paragraph 7 of the Third Amended Complaint states a legal conclusion to which no response is required.

8.      Foundation Medicine admits that it uses, offers for sale, and sells FoundationACT® in this judicial district.  Foundation Medicine denies that it uses FoundationACT® throughout the United States.  The remainder of Paragraph 8 of the Third Amended Complaint states a legal conclusion to which no response is required.

9.      Paragraph 9 of the Third Amended Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Foundation Medicine admits that it sells FoundationACT® in Delaware but denies the remaining allegations in Paragraph 9.

10.     Paragraph 10 of the Third Amended Complaint states a legal conclusion to which no response is required.

## BACKGROUND

11.     Foundation Medicine repeats, re-alleges, and incorporates by reference its responses to the allegations of Paragraphs 1-10 of the Third Amended Complaint as if fully set forth herein.

12.     Foundation Medicine admits that it commercially launched FoundationACT® in mid-2016.  Foundation Medicine further admits that Exhibit 5 to the Third Amended Complaint purports to be a copy of a Foundation Medicine press release that contains, *inter alia*, the language quoted in Paragraph 12.

13.     Foundation Medicine admits that Exhibit 6 to the Third Amended Complaint purports to be a copy of a poster entitled "Genomic profiling of circulating tumor DNA (ctDNA) from patients with advanced cancers of the GI tract and anus," which purports to contain a description of the FoundationACT® test, and that this poster was presented at a conference by scientists affiliated with Foundation Medicine. Foundation Medicine further admits that Exhibit 6 contains, *inter alia,* the figure in Paragraph 13 of the Third Amended Complaint. Foundation Medicine denies the remaining allegations of Paragraph 13 and any other characterization of the poster referenced therein that is inconsistent with the plain language of the poster.

14.     Foundation Medicine admits that Paragraph 14 of the Third Amended Complaint purports to quote claim 1 of the '731 patent. Foundation Medicine denies the remaining allegations of Paragraph 14 of the Third Amended Complaint.

15.     Foundation Medicine denies the allegations of Paragraph 15 of the Third Amended Complaint.

16.     Foundation Medicine admits that Exhibit 7 to the Third Amended Complaint purports to be a claim chart. Foundation Medicine denies the remaining allegations in Paragraph 16 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 7.

17.     Foundation Medicine admits that Paragraph 17 of the Third Amended Complaint purports to quote claim 1 of the '822 patent. Foundation Medicine denies the remaining allegations of Paragraph 17 of the Third Amended Complaint.

18.     Foundation Medicine denies the allegations of Paragraph 18 of the Third Amended Complaint.

19.     Foundation Medicine admits that Exhibit 8 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 19 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 8.

20.     Foundation Medicine admits that Paragraph 20 of the Third Amended Complaint purports to quote claim 1 of the '743 patent.  Foundation Medicine denies the remaining allegations of Paragraph 20 of the Third Amended Complaint.

21.     Foundation Medicine admits that Exhibit 9 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 21 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 9.

22.     Foundation Medicine admits that Paragraph 22 of the Third Amended Complaint purports to quote claim 1 of the '992 patent.  Foundation Medicine denies the remaining allegations of Paragraph 22 of the Third Amended Complaint.

23.     Foundation Medicine denies the allegations of Paragraph 23 of the Third Amended Complaint.

24.     Foundation Medicine admits that Exhibit 10 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 24 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 10.

**WILLFUL INFRINGEMENT**

25.     Foundation Medicine denies the allegations of Paragraph 25 of the Third Amended Complaint.

26.     Foundation Medicine admits that Paragraph 26 of the Third Amended Complaint quotes a sentence that appears in an email sent from Travis Clark to others at Foundation Medicine on February 20, 2015, but otherwise denies the allegations of Paragraph 26 of the Third Amended Complaint.

27.     Foundation Medicine admits that it filed a lawsuit for patent infringement against Guardant on May 17, 2016.  Foundation Medicine also admits that the '731 patent issued on March 21, 2017, and that Foundation Medicine did not become aware of the '731 patent until the date of the original complaint in this case.  Foundation Medicine denies the remaining allegations of Paragraph 27 of the Third Amended Complaint.

28.     Foundation Medicine admits that Dr. Lipson provided deposition testimony. Foundation Medicine denies that Guardant accurately characterizes or quotes that deposition testimony and therefore denies the remaining allegations of Paragraph 28 of the Third Amended Complaint.

29.     ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████     Foundation denies that Guardant otherwise accurately characterizes the deposition testimony in the first four sentences of Paragraph 29 of the Third Amended Complaint and therefore denies the remaining allegations in those sentences. Foundation Medicine denies the allegation in the fifth sentence of Paragraph 29 of the Third Amended Complaint.

30.     Foundation Medicine admits the allegations contained within the first three sentences of Paragraph 30 of the Third Amended Complaint.  Foundation Medicine denies the remaining allegations of Paragraph 30 of the Third Amended Complaint.

## COUNT I

31.     Foundation Medicine repeats, re-alleges, and incorporates by reference its responses to the allegations of Paragraphs 1-30 of the Third Amended Complaint as if fully set forth herein.

32.     Foundation Medicine admits that the '731 patent is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation," and that the '731 patent on its face recites an issue date of March 21, 2017.  Foundation Medicine denies that Guardant is the owner of all rights, title to, and interest in the '731 patent. ███████████████████████

████████████████████████████████████████████████

██████████████████████████

33.     Foundation Medicine admits that Exhibit 7 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 33 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 7.

34.     Foundation Medicine denies the allegations in Paragraph 34 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 7.

35.     Foundation Medicine denies the allegations in Paragraph 35 of the Third Amended Complaint.

## COUNT II

36.     Foundation Medicine repeats, re-alleges, and incorporates by reference its responses to the allegations of Paragraphs 1-35 of the Third Amended Complaint as if fully set forth herein.

37.     Foundation Medicine admits that the '822 patent is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation," and that the '822 patent on its face recites an issue date of December 5, 2017.  Foundation Medicine denies that Guardant is the owner of all rights, title to, and interest in the '822 patent. ██████████████████████████

████████████████████████████████████████████████████

████████████

38.     Foundation Medicine admits that Exhibit 8 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 38 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 8.

39.     Foundation Medicine denies the allegations in Paragraph 39 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 8.

40.     Foundation Medicine denies the allegations in Paragraph 40 of the Third Amended Complaint.

## COUNT III

41.     Foundation Medicine repeats, re-alleges, and incorporates by reference its responses to the allegations of Paragraphs 1-40 of the Third Amended Complaint as if fully set forth herein.

42.     Foundation Medicine admits that the '743 patent is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation," and that the '743 patent on its face recites an issue date of December 12, 2017.  Foundation Medicine denies that Guardant is the owner of all rights, title to, and interest in the '743 patent. ████████████████████ ██████████████████████████████████████████ ████████████

43.     Foundation Medicine admits that Exhibit 9 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 43 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 9.

44.     Foundation Medicine denies the allegations in Paragraph 44 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 9.

45.     Foundation Medicine denies the allegations in Paragraph 45 of the Third Amended Complaint.

**COUNT IV**

46.     Foundation Medicine repeats, re-alleges, and incorporates by reference its responses to the allegations of Paragraphs 1-45 of the Third Amended Complaint as if fully set forth herein.

47.     Foundation Medicine admits that the '992 patent is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation," and that the '992 patent on its face recites an issue date of February 27, 2018.  Foundation Medicine denies that Guardant is the owner of all rights, title to, and interest in the '992 patent. ████████████████████

████████████████████████████████████

███████

48.     Foundation Medicine admits that Exhibit 10 to the Third Amended Complaint purports to be a claim chart.  Foundation Medicine denies the remaining allegations in Paragraph 48 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 10.

49.     Foundation Medicine denies the allegations in Paragraph 49 of the Third Amended Complaint and denies the allegations in the accompanying claim chart attached to the Third Amended Complaint as Exhibit 10.

50.     Foundation Medicine denies the allegations in Paragraph 50 of the Third Amended Complaint.

### JURY DEMAND

51.     The Third Amended Complaint sets forth a demand for a trial by jury.  Pursuant to Fed. R. Civ. P. 38, Foundation Medicine likewise demands a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

A.     Foundation Medicine denies that Guardant is entitled to any of its requested relief, including that sought in paragraphs A-E of Guardant's Prayer for Relief or any other type of recovery from Foundation Medicine.  Guardant's prayer should, therefore, be denied in its entirety and with prejudice.

B.     Foundation Medicine asks that judgment be entered for Foundation Medicine.

C.     Foundation Medicine denies any allegation in the Third Amended Complaint not specifically admitted.

## DEFENSES

<u>First Defense</u>

The Third Amended Complaint fails to state a claim upon which relief can be granted.

<u>Second Defense</u>

Foundation Medicine does not infringe and has not infringed, literally or by the doctrine of equivalents, any valid and enforceable claims of the '731, '822,'743, and '992 patents.

<u>Third Defense</u>

The claims of the '731, '822,'743, and '992 patents are invalid because they fail to satisfy one or more of the conditions for patentability stated in Title 35 of the United States Code, including without limitation, §§ 101, 102, 103, and 112 and/or the claims are otherwise unenforceable.

<u>Fourth Defense</u>

Guardant's claim for damages is limited by 35 U.S.C. §§ 286 and 287(a).

<u>Fifth Defense</u>

Guardant's claim for injunctive relief is barred because it has an adequate remedy at law; it is not being, and is not in danger of being, irreparably injured; the balance of the hardships is not in its favor; and the public interest is not served by the granting of injunctive relief.

<u>Sixth Defense</u>

Guardant's claims are barred by the doctrine of prosecution history estoppel.  During prosecution of the '731 , '822,'743, and '992 patents, Guardant or its patent agent or attorney made amendments, took positions, or made concessions, statements, or representations that estop Guardant from asserting the '731, '822, '743, and '992  patents against any product made, used, sold, or offered for sale by Foundation Medicine.

### Seventh Defense

Foundation Medicine incorporates herein by reference the facts set forth with particularity in its Counterclaims, *infra*.  As alleged in the incorporated paragraphs, the '731 Patent, the '822 Patent, the '743 Patent, and the '992 Patent are unenforceable due to the inequitable conduct of Helmy Eltoukhy ("Dr. Eltoukhy") and AmirAli Talasaz ("Dr. Talasaz"), two of the named inventors.

### Eighth Defense

Foundation Medicine incorporates herein by reference the facts set forth with particularity in its Counterclaims, *infra*.  Any purported claim by Plaintiff for equitable relief is barred by the doctrine of unclean hands.

### Ninth Defense

Foundation Medicine incorporates herein by reference the facts set forth with particularity in its Counterclaims, *infra*, as if fully set forth herein.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

<u>Tenth Defense</u>

Foundation Medicine incorporates herein by reference the facts set forth with particularity

in its Counterclaims, *infra*, as if fully set forth herein. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

- 13 -

<u>Additional Defenses</u>

Foundation Medicine reserves the right to assert additional defenses as they become known through further investigation and discovery.

## COUNTERCLAIMS

The asserted Guardant patents are invalid under one or more of 35 U.S.C. §§ 101, 102, 103, and 112.

For example, and without in any manner limiting the foregoing, U.S. Patent No. 9,840,743 ("the '743 patent") is invalid under 35 U.S.C. § 101 for having claims directed to patent ineligible subject matter.  Claim 1 of the '743 patent is directed to a method for detecting copy number variation and but for a routine "sequencing" step, only recites a series of generic mental or abstract steps that can be performed with conventional computer technology and bioinformatic software:  (a) "sequencing extracellular polynucleotides from a bodily sample from a subject, wherein each of the extracellular polynucleotides generates a plurality of sequence reads," (b) "filtering out reads that fail to meet a set accuracy, quality score, or mapping score threshold," (c) "mapping the plurality of sequence reads to a reference sequence," (d) "quantifying mapped reads or unique sequence reads in a plurality of predefined regions of the reference sequence," (e) "determining copy number variation in one or more of the plurality of predefined regions by: i) normalizing a number of reads in the plurality of predefined regions to each other, or a number of unique sequence reads in the plurality of predefined regions to each other; and/or ii) processing a number of reads in the plurality of predefined regions or a number of unique sequence reads in the plurality of predefined regions with numbers obtained from a control sample."

An exemplary prior art scientific publication that describes the use of computer technology and algorithms for determining copy number variation is Sathirapongsasuti, J. et al., "Exome sequencing-based copy-number variation and loss of heterozygosity detection: ExomeCNV,"

*Bioinformatics*, Aug. 9, 2011, Vol. 27, no. 19, pp. 2648-2654." This publication does not appear on the list of publications considered by the patent office on the face pages of the '743 patent. This and other prior art directed to determining copy-number variation by nucleic acid sequencing further demonstrate that the '743 patent is anticipated and/or obvious under 35 U.S.C. §§ 102 and 103.

As a further example, and without in any manner limiting the foregoing, U.S. Patent Nos. 9,598,731 and 9,834,822, are also invalid under 35 U.S.C. §§ 102 and 103. Both of these patents are directed to a method of preparing and sequencing cell-free DNA, and share similar steps: (a) providing cell-free DNA, (b) attaching or converting cell-free DNA molecules with "non-unique" barcode tags or sequences, (c) amplifying these tagged DNA molecules, (d) sequencing the amplified DNA, (e)/(f) grouping and mapping the sequence reads, (g)/(h)/(i) [sequence analysis including determining/identifying consensus sequences, frequency, and/or base calls].

As a further example, and without in any manner limiting the foregoing, U.S. Patent No. 9,902,992 is also invalid under 35 U.S.C. §§ 102 and 103. Similar to U.S. Patent Nos. 9,598,731 and 9,834,822, the '992 patent is directed to a method of preparing and sequencing cell-free DNA that includes the steps of: (a) providing cell-free DNA, (b) attaching barcode tags, (c) amplifying the tagged DNA molecules, (d) sequencing the amplified DNA, (e) mapping the sequence reads, (f) grouping the sequencing reads, (g) collapsing sequence reads, and (h) detecting different types of genetic aberrations.

An exemplary prior art reference that anticipates and/or makes obvious the '731, '822, and '992 patents is: Schmitt, M., et al., "Detection of ultra-rare mutations by next-generation sequencing," *Proc. Natl. Acad. Sci. USA,* Sep. 4, 2011, Vol. 109, No. 36, pp. 14508-14513. This

paper is directed to a method termed "Duplex Sequencing," that "greatly reduces errors by independently tagging and sequencing each of the two strands of a DNA duplex."

Each of the asserted Guardant patents is also invalid under 35 U.S.C. § 112 due to over-breadth.  For example, and without in any manner limiting the foregoing, these patents include claims that have no limitations on the type of sequencing, on the number of nucleic acid molecules that are sequenced, or on the sensitivity and/or accuracy of the claimed methods.

Each of the asserted Guardant patents is also unenforceable due to the inequitable conduct of Guardant's founders, Dr. Talasaz and Dr. Eltoukhy, who conspired to mislead and defraud the United States Patent and Trademark Office ("USPTO") with respect to the inventorship of the claimed inventions.  Specifically, Dr. Talasaz and Dr. Eltoukhy intentionally failed to identify Dr. Eltoukhy as a named inventor of the fundamental alleged inventions of the asserted patents despite his substantial contribution to those alleged inventions.  They did so because Dr. Eltoukhy was still employed by Illumina, Inc. at the time and, on information and belief, had signed a standard intellectual property assignment agreement as a condition of his employment that would have required him to assign his interest in the asserted patents to Illumina.  In fact, evidence that has recently come to light in this case reveals that Dr. Eltoukhy used Illumina's confidential information while he was at Illumina to develop the idea at the core of the asserted claims.  Dr. Eltoukhy and Dr. Talasaz thus deceived the USPTO with the specific ill intent to avoid any ownership claim by Illumina, and to conceal the fact that they had misappropriated confidential Illumina information.  The asserted patents are therefore unenforceable.

Moreover, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

- 16 -

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

**THE PARTIES**

1.     Foundation Medicine is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 150 Second Street, Cambridge, MA 02141.

2.     Upon information and belief, Guardant is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 505 Penobscot Dr., Redwood City, CA 94063.

**JURISDICTION AND VENUE**

3.     These counterclaims arise under the Declaratory Judgment Act and the Patent Act, Titles 28 and 35 of the United States Code.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

4.     This Court has personal jurisdiction over Guardant because Guardant has submitted itself to this Court's jurisdiction by filing its Third Amended Complaint in this Court, and because, upon information and belief, Guardant is a Delaware corporation.

- 17 -

5.      Venue is proper in this Court under 28 U.S.C. § 1400(b) at least because Guardant submitted itself to this Court's venue by filing its Third Amended Complaint in this Court.

## THE PATENTS-IN-SUIT

6.      The '731 patent, on its face, is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation."

7.      Guardant purports to be the owner of the entire right, title and interest in and to the '731 patent.

8.      The '822 patent, on its face, is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation."

9.      Guardant purports to be the owner of the entire right, title and interest in and to the '822 patent.

10.      The '743 patent, on its face, is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation."

11.      Guardant purports to be the owner of the entire right, title and interest in and to the '743 patent.

12.      The '992 patent, on its face, is entitled "Systems and Methods to Detect Rare Mutations and Copy Number Variation."

13.      Guardant purports to be the owner of the entire right, title and interest in and to the '992 patent.

## TECHNOLOGY UNDERLYING THE PATENTS-IN-SUIT

14.      The asserted patents are directed generally to a method of extracting cell-free DNA ("cfDNA") from a bodily sample, preparing the cfDNA for sequencing (or determining the order of nucleotides in the cfDNA segment(s), sequencing the cfDNA sample, and then applying data processing steps to the sequenced cfDNA sample to detect mutations associated with cancer.

15.     The pre-sequencing preparation steps may involve converting a long double stranded DNA molecule (which would contain too many nucleotide base pairs to be sequenced at once) into a single strand of DNA that is fragmented into small segments.  Pre-sequencing preparation steps may also involve "amplification," which refers to a process of making many copies (known as amplicons) of the DNA fragments to be sequenced.  Amplification allows for a large number of copies of the DNA fragments of interest to be sequenced simultaneously.

16.     Both amplification and sequencing can produce errors.  An amplification error occurs when an amplicon has been miscopied, which means that a base at a particular position in an amplicon is different from the base at the same position in the original DNA fragment. A sequencing error occurs when the sequencer has misread or incorrectly identified a base of the amplicon.  Errors can impact the process of identifying true mutations in a DNA segment.  For example, amplification or sequencing errors may result in false positive reporting for a genetic variation that does not actually exist in the original DNA fragment.

17.     The asserted patents are directed to a purported solution for this problem. According to Guardant's technical presentation to the Court in connection with the claim construction hearing (the "Technical Tutorial"), the inventors of the asserted patents "were originally trained in electrical engineering" and "leverag[ed] their experience in signal communications" to find a solution to the problem of amplification and sequencing errors.  The inventors "realized that the sequence of a polynucleotide can be thought of as an original message. This message must be both amplified, sent through a communication channel, then read and decoded.  During each of these steps, noise can be introduced into the signal, distorting it. However, noise can be reduced."

- 19 -

18.     Guardant's Tutorial also states that Guardant's "innovative" method of reducing "noise" (or false positives) involved "tagging the signal (cfDNA molecules) prior to amplification" with molecular barcodes so that amplicons could be analyzed as "a group, or family of related sequences."  By analyzing families of signals, a consensus sequence can be generated that substantially eliminates errors that may have arisen in any single sequence analysis."  In other words, any errors present in only one or a few of the amplicons could be assumed to be an error that arose during the amplification process.  Analyzing a "consensus sequence" (representing the sequence reads in the family as a whole) rather than individual sequence reads would ensure that "any noise that may be introduced to one particular signal will not affect the total output of the whole family."

19.     This "innovative method," which Guardant describes in its public materials and its Technical Tutorial as "Digital Sequencing," is the technology underlying Guardant's asserted patents in this litigation.

**GUARDANT'S INEQUITABLE CONDUCT**

a.     **Dr. Eltoukhy Misused Confidential Illumina Information to Conceive of the Claimed Invention**

20.     Publicly, to their customers and investors, Dr. Eltoukhy and Dr. Talasaz describe Guardant's founding and the invention of their patented method as "fated." ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████

21.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████

22.     This founding history is also widely accepted internally at Guardant.  For example, Stefanie Mortimer ("Dr. Mortimer"), Guardant's former Director of Technology Development and one of Guardant's corporate representatives, ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

23.     Justin Odegaard, Guardant's Vice President of Clinical Development, testified that it was ████████████████████████████████████████████████████████

██████████████████████████████████████████

24.     Richard Lanman, Guardant's Chief Medical Officer, ████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████  He further testified that ████████████████████████████████████████

- 21 -

███████████████████████████████████████████████████████████████████████

████████████████████████

25.     Evidence that has recently come to light in this case reveals, however, that the real story of Guardant's conception of the claimed inventions does not match the version Dr. Eltoukhy and Dr. Talasaz have shared with the USPTO.

26.     In reality, Dr. Eltoukhy and Dr. Talasaz worked together at Illumina, Inc., a company known for its genetic sequencing solutions, on projects closely related to the technology underlying what ultimately became the claimed invention.  For example, in 2011, Dr. Talasaz and Dr. Eltoukhy worked together on what Illumina referred to internally as ███████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

27.     Dr. Talasaz and Dr. Eltoukhy also frequently reviewed and exchanged articles and other materials related to the work they were doing at Illumina.  ███████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████

28.     On December 9, 2011, while both Dr. Eltoukhy and Dr. Talasaz were still employed at Illumina, Guardant Health, Inc. was incorporated in Delaware by Michael Wiley ("Mr. Wiley"), Guardant's Chief Legal Officer.

29.     Around the same time, Dr. Eltoukhy and Dr. Talasaz also obtained the domain name "GuardantHealth.com," and both had "@guardanthealth.com email addresses at least as of July 2012.  Each was heavily involved in (and worked closely together on) activities related to the early days of the founding of their new company, including the development of business plans, presentations to prospective investors, and continued development of Guardant technologies and products. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

30.     According to his LinkedIn page, in June 2012, approximately six months after Guardant was incorporated, Dr. Talasaz left Illumina.

31.     Dr. Eltoukhy remained at Illumina for another six months.  During that time, he and Dr. Talasaz repeatedly took advantage of Dr. Eltoukhy's continued access to Illumina's confidential information. ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

- 23 -

32. 





(highlighting added)

33.      As the highlighted portions above demonstrate, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

34.      ████████████████████████████████████

████████████████████████████████████████████



35.  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

36.      In its response to Defendants' Joint Interrogatory No. 1 in this litigation, Guardant

has represented that the '731, '822, and '743 patents "resulted from the research efforts of AmirAli

Talasaz" who "conceived of and reduced to practice the claimed inventions of these patents at least

as early as **July 2012**" (emphasis added).  It is accordingly Guardant's position that Dr. Talasaz,

acting alone, conceived of the claimed invention days after Dr. Eltoukhy sent directly relevant and

confidential information to his personal email account.

37.  ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

38. ████████████████████████████████████████

39.     On September 4, 2012, approximately two months later, provisional application no. 61/696,734 was filed, to which the '731, '822, and '743 patents claim priority.  Guardant identified only Dr. Talasaz as an inventor on the application.  On information and belief, Dr. Eltoukhy and Dr. Talasaz jointly caused application no. 61/696,734 to be filed.

40. ████████████████████████████████████████



(highlighting added)

41.     Dr. Eltoukhy testified that he left Illumina in late December 2012 and officially joined Guardant Health as its CEO in early January 2013.

42.     On March 5, 2014, approximately *fourteen months* after Dr. Eltoukhy left Illumina and joined Guardant Health, Guardant filed provisional application no. 61/948,530, to which the '992 patent claims priority.  The '992 patent is the only patent for which Dr. Eltoukhy is a named inventor, and the only patent for which Dr. Eltoukhy testified he had made contributions.

43.     In his deposition, Dr. Eltoukhy testified that



44.

45.     Indeed, Guardant implicitly acknowledged that Dr. Eltoukhy contributed to the core inventions claimed in this patent family by naming him as an inventor of the '992 patent.  For example, limitations b through f in Claim 1 of the '992 patent claim highly similar concepts to the other asserted patents and the information contained in Illumina's confidential documents, including "attaching tags comprising barcodes . . . to the cfDNA molecules," "amplifying the tagged parent polynucleotides to produce amplified tagged progeny polynucleotides," "sequencing the amplified tagged progeny polynucleotides," "grouping the sequence reads mapped in e) into families based at least on barcode sequences of the sequence reads," and "collapsing sequence reads in each family to yield a base call for each family at the genetic locus."  In fact, the

specification for the '992 is *nearly identical* to the specifications of the '731, '822, and '743 patents.

46. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

47. ██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

48. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

49. Dr. Eltoukhy has *expressly* admitted and represented that he had a significant role in the conception of the basis for the inventions of the asserted patents. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

50.



(highlighting added)

b.    **The Deposition Testimony of Guardant's Own Witnesses Corroborates That Dr. Eltoukhy Substantially Contributed to the Conception of the Claimed Inventions of the Asserted Patents**

51.    Dr. Eltoukhy substantially contributed to the conception of the inventions claimed in each of the asserted patents.  Each of the asserted patents is directed generally to a method for identifying tumor markers in cfDNA by (i) attaching molecular barcodes to collected DNA fragments; (ii) amplifying the barcoded DNA fragments (creating tagged amplicons); (iii) sequencing those amplicons; (iv) grouping the sequence reads as a "family" based, in part, on the barcodes; and (v) analyzing those families to generate a consensus sequence to reduce or eliminate amplification or sequencing errors.  *See e.g.,* Claim 1 of the '731, '822, and '992 patents; Claims 5, 6, 9, 15, 16, 17 of the '743 patent.

52.    In certain respects, Dr. Eltoukhy's contribution consisted of taking and using Illumina confidential information directly related to the core idea of the claimed invention. ▮

- 31 -

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████

53.    When asked at his deposition, Dr. Eltoukhy confirmed that he had contributed to

the Digital Sequencing "breakthrough." ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████

54.    Moreover, Dr. Eltoukhy admitted in his deposition with respect to the '992 patent

-- the only patent on which he is a named inventor and which shares, in significant part, a

specification with the other asserted patents – ████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████

55.    At her deposition, Dr. Mortimer testified that ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

56.    Dr. Mortimer ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████

c.    **Dr. Talasaz and Dr. Eltoukhy Fraudulently Omitted Dr. Eltoukhy as a Named Inventor on the Asserted Patents**

57.    Despite Dr. Eltoukhy's substantial contributions to the conception of the claimed inventions, Dr. Eltoukhy and Dr. Talasaz did not identify Dr. Eltoukhy as an inventor of the '731, '822, or '743 patents.  Instead, for those three asserted patents, only Dr. Talasaz was named an inventor.

58.    U.S. Provisional Application No. 61/696,734 was filed on September 4, 2012 and identified Dr. Talasaz as the sole inventor.  The '731, '822, and '743 patents claim priority to this provisional application.  On information and belief, including the evidence that has come to light in this case, Dr. Eltoukhy and Dr. Talasaz did not identify Dr. Eltoukhy as an inventor because he was still employed by Illumina and had signed an assignment agreement with Illumina as a condition of his employment.  Dr. Eltoukhy and Dr. Talasaz thus conspired to defraud the USPTO with respect to the inventorship of the asserted patents.

59.    On May 14, 2015, Guardant filed U.S. Patent Application No. 14/712,754 (the "'754 Application), which eventually issued as the '731 patent.  Dr. Eltoukhy and Dr. Talasaz submitted the '754 Application Data Sheet, which states that "All Inventors Must be Listed," and identified Dr. Talasaz as the sole inventor.   On May 14, 2015, consistent with this misrepresentation, they submitted a declaration from Dr. Talasaz identifying only Dr. Talasaz as an inventor.  No such declaration was submitted for Dr. Eltoukhy.  Nor was Dr. Eltoukhy identified as an inventor at any point during the prosecution of the '754 Application.  The '731 patent issued on March 12, 2017, identifying Dr. Talasaz as the sole inventor.

60.    On March 23, 2017, Guardant filed U.S. Patent Application No. 15/467,570 (the "'570 Application"), which eventually issued as the '743 patent.  The same day, Dr. Eltoukhy and Dr. Talasaz each filed declarations in which they both swore under oath that they were inventors

of the invention claimed in the '570 Application.  However, on July 20, 2017, Dr. Eltoukhy and

Dr. Talasaz submitted a Request for Correction of Inventorship under 37 C.F.R. § 1.48 , which

asked for Dr. Eltoukhy to be "delete[d]" as an inventor.  The request attached a "Corrected

Application Data Sheet" which struck out Dr. Eltoukhy's name as an inventor.  At no point during

the prosecution of the '570 Application was inventorship further corrected to re-instate

Dr. Eltoukhy as an inventor.  The '743 patent issued on December 12, 2017, identifying Dr.

Talasaz as the sole inventor.  In its responses to interrogatories in this case, Guardant has stated

that all of the claims of the '743 patent are entitled to a September 4, 2012 priority date, the date

that the original '734 provisional application was filed while Dr. Eltoukhy still worked at Illumina.

61.    On April 20, 2017, Guardant filed U.S. Patent Application No. 15/492,659 (the

"'659 Application"), which eventually issued as the '822 Patent.  Dr. Eltoukhy and Dr. Talasaz

submitted the '659 Application Data Sheet identifying Dr. Talasaz as the sole inventor.  On March

2, 2015, consistent with this misrepresentation, they submitted a declaration from Dr. Talasaz

identifying only Dr. Talasaz as an inventor.  No such declaration was submitted for Dr. Eltoukhy.

Nor was Dr. Eltoukhy identified as an inventor at any point during the prosecution of the '659

Application.  The '822 patent issued on December 5, 2017, identifying Dr. Talasaz as the sole

inventor.

62.    In light of his substantial contributions to the claimed invention, Dr. Eltoukhy was

accordingly inappropriately and intentionally omitted as a named inventor for the applications

leading to the asserted patents.

**d.    Dr. Eltoukhy and Dr. Talasaz's Misrepresentations Regarding Inventorship Were Material to Patentability**

63.    Misrepresentations regarding inventorship are highly material to the patentability

of the claimed invention.  35 U.S.C. §115 requires all patent applications to "include, or be

amended to include, the name of the inventor for any invention claimed in the application.  Except as otherwise provided in this section, each individual who is the inventor or a joint inventor of a claimed invention in an application for patent shall execute an oath or declaration in connection with the application."

64.    35 U.S.C. §116 provides that "[w]hen an invention is made by two or more persons jointly, they **shall** apply for patent jointly and each make the required oath, except as otherwise provided in this title" (emphasis added).

65.    The Manual of Patent Examining Procedure ("MPEP") instructs examiners to reject applications with improper inventorship.  *See* MPEP §2157 "Improper Naming of Inventors" which provides that "the patent laws [] require the naming of the actual inventor or joint inventors of the claimed subject matter."  When the application "does not name the correct inventorship and the applicant has not filed a request to correct inventorship under 37 CFR 1.48, Office personnel **should reject the claims under 35 U.S.C. 101 and 35 U.S.C. 115."** (emphasis added).

66.    Information regarding the correct inventorship of the asserted patents was not otherwise available to the USPTO.

67.    The USPTO would not have allowed claims to issue if it had been aware of the misrepresentations made by Dr. Eltoukhy and Dr. Talasaz regarding the inventorship of the asserted patents.

68.    Furthermore, these misrepresentations and pattern of deceptive behavior, including the unmistakably false declarations submitted in support of the patent applications and suppression of evidence relating to Dr. Eltoukhy's inventorship constitute egregious misconduct in the prosecution of the asserted patents.

e.     **Dr. Talasaz and Dr. Eltoukhy Misrepresented Inventorship with the Specific Intent to Deceive the USPTO, Rendering the Patents Unenforceable**

69.     On information and belief, based on the evidence that has come to light in this case through discovery, Dr. Eltoukhy and Dr. Talasaz conspired to misrepresent inventorship to the USPTO in order to conceal or prevent Illumina's potential ownership interests in the asserted patents.  Dr. Eltoukhy was aware and testified that at the time the applications were filed, he had signed an assignment agreement as a condition of his employment with Illumina.   On information and belief, Dr. Talasaz also understood that both he and Dr. Eltoukhy had an assignment obligation for any invention that either conceived of while employed at Illumina.

70.     Because of Dr. Eltoukhy's assignment obligation, Dr. Talasaz and Dr. Eltoukhy ensured that only Dr. Talasaz, who had left Illumina earlier in June 2012, was identified as a named inventor for the '731, '822, and '743 patents.

71.     Dr. Eltoukhy and Dr. Talasaz knew and understood their obligations to make truthful representations to the USPTO regarding inventorship, yet omitted material information regarding inventorship from the '731, '822, and '743 patent applications, thereby rendering their sworn declarations incomplete and inaccurate.  Both knew that Dr. Eltoukhy had made substantial contributions to the claimed invention.  They also understood that their misrepresentations to the USPTO regarding the inventorship of the claimed invention were material to the patentability of the asserted patents.

72.     Together, Dr. Eltoukhy and Dr. Talasaz made both affirmative misrepresentations and omissions of material information to the USPTO in an effort to suppress evidence regarding Dr. Eltoukhy's inventorship of the '731, '822, and '743 patents.

73.     These misrepresentations and omissions of material information were thus made with the specific intent of deceiving the USPTO, which would otherwise not have allowed any of

the claims of the '731, '822, or '743 patents.  Given Dr. Eltoukhy and Dr. Talasaz's selective identification of Dr. Eltoukhy as an inventor on the substantially similar '992 patent, their removal of Dr. Eltoukhy as an inventor of the '743 patent, Dr. Eltoukhy's misuse of related Illumina confidential information, Dr. Eltoukhy's awareness of his assignment obligation to Illumina, and his close involvement in the research and development of the claimed invention, the single most reasonable inference is that they acted with the specific intent to deceive the USPTO.

74.     Dr. Eltoukhy and Dr. Talasaz's inequitable conduct also directly relates to the '992 patent.  By not naming Dr. Eltoukhy as an inventor on the '731, '822, and '743 patents, Dr. Eltoukhy and Dr. Talasaz concealed that Dr. Eltoukhy also invented the fundamental ideas underlying the '992 patent.

75.     Because Dr. Eltoukhy and Dr. Talasaz made affirmative misrepresentations and omissions regarding information material to patentability with the specific intent to deceive the USPTO, the asserted patents are unenforceable.

76.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████

## FIRST COUNTERCLAIM

(Declaration that Foundation Medicine Does Not Infringe the '731 Patent)

77.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

78.     Foundation Medicine has not infringed and is not infringing, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '731 patent.

79.     Foundation Medicine is entitled to a declaratory judgment that it does not infringe, either directly or indirectly, and has not infringed, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '731 patent.

## SECOND COUNTERCLAIM

(Declaration of Invalidity of the '731 Patent)

80.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

81.     The claims of the '731 patent are invalid because they fail to meet one or more requirements set forth in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

82.     Foundation Medicine is entitled to a declaratory judgment that the '731 patent is invalid for failure to satisfy one or more of the requirements for patentability stated in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

## THIRD COUNTERCLAIM

(Declaration of Unenforceability of the '731 Patent)

83.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

84.     The claims of the '731 patent are unenforceable due to the inequitable conduct of Dr. Eltoukhy and Dr. Talasaz, who made material misrepresentations regarding inventorship with the specific intent to deceive the USPTO.

85.     Foundation Medicine is entitled to a declaratory judgment that the '731 patent is unenforceable.

## FOURTH COUNTERCLAIM



86.     Foundation Medicine repeats and re-alleges the foregoing paragraphs (including, but not limited to, the introductory paragraphs) as if fully set forth herein.

87.

88.

89.

90.

## FIFTH COUNTERCLAIM

(Declaration that Foundation Medicine Does Not Infringe the '822 Patent)

91.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

92.     Foundation Medicine has not infringed and is not infringing, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '822 patent.

93.     Foundation Medicine is entitled to a declaratory judgment that it does not infringe, either directly or indirectly, and has not infringed, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '822 patent.

## SIXTH COUNTERCLAIM

(Declaration of Invalidity of the '822 Patent)

94.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

95.     The claims of the '822 patent are invalid because they fail to meet one or more requirements set forth in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

96.     Foundation Medicine is entitled to a declaratory judgment that the '822 patent is invalid for failure to satisfy one or more of the requirements for patentability stated in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

## SEVENTH COUNTERCLAIM

(Declaration of Unenforceability of the '822 Patent)

97.     Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

98.     The claims of the '822 patent are unenforceable due to the inequitable conduct of Dr. Eltoukhy and Dr. Talasaz, who made material misrepresentations regarding inventorship with the specific intent to deceive the USPTO.

99.     Foundation Medicine is entitled to a declaratory judgment that the '822 patent is unenforceable.

## EIGHTH COUNTERCLAIM



100.    Foundation Medicine repeats and re-alleges the foregoing paragraphs (including, but not limited to, the introductory paragraphs) as if fully set forth herein.

101.

102.

103.

104.

## NINTH COUNTERCLAIM

(Declaration that Foundation Medicine Does Not Infringe the '743 Patent)

105.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

106.    Foundation Medicine has not infringed and is not infringing, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '743 patent.

107.    Foundation Medicine is entitled to a declaratory judgment that it does not infringe, either directly or indirectly, and has not infringed, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '743 patent.

## TENTH COUNTERCLAIM

(Declaration of Invalidity of the '743 Patent)

108.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

109.    The claims of the '743 patent are invalid because they fail to meet one or more requirements set forth in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

110.    Foundation Medicine is entitled to a declaratory judgment that the '743 patent is invalid for failure to satisfy one or more of the requirements for patentability stated in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.'

## ELEVENTH COUNTERCLAIM

(Declaration of Unenforceability of the '743 Patent)

111.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

112.     The claims of the '743 Patent are unenforceable due to the inequitable conduct of Dr. Eltoukhy and Dr. Talasaz, who made material misrepresentations regarding inventorship with the specific intent to deceive the USPTO.

113.     Foundation Medicine is entitled to a declaratory judgment that the '743 patent is unenforceable.

## <u>TWELFTH COUNTERCLAIM</u>



114.     Foundation Medicine repeats and re-alleges the foregoing paragraphs (including, but not limited to, the introductory paragraphs) as if fully set forth herein.

115.

116.

117.

118.

- 43 -

## THIRTEENTH COUNTERCLAIM

(Declaration that Foundation Medicine Does Not Infringe the '992 Patent)

119.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

120.    Foundation Medicine has not infringed and is not infringing, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '992 patent.

121.    Foundation Medicine is entitled to a declaratory judgment that it does not infringe, either directly or indirectly, and has not infringed, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '992 patent.

## FOURTEENTH COUNTERCLAIM

(Declaration of Invalidity of the '992 Patent)

122.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

123.    The claims of the '992 patent are invalid because they fail to meet one or more requirements set forth in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

124.    Foundation Medicine is entitled to a declaratory judgment that the '992 patent is invalid for failure to satisfy one or more of the requirements for patentability stated in Title 35 of the United States Code, including, among other sections, §§ 101, 102, 103, and 112.

## FIFTEENTH COUNTERCLAIM

(Declaration of Unenforceability of the '992 Patent)

125.    Foundation Medicine repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

126.    The claims of the '992 Patent are unenforceable due to the inequitable conduct of Dr. Eltoukhy and Dr. Talasaz who made material misrepresentations regarding inventorship with the specific intent to deceive the USPTO.

127.    Foundation Medicine is entitled to a declaratory judgment that the '992 Patent is unenforceable.

## SIXTEENTH COUNTERCLAIM



128.    Foundation Medicine repeats and re-alleges the foregoing paragraphs (including, but not limited to, the introductory paragraphs) as if fully set forth herein.

129.

130.

131.

132.

- 45 -

## PRAYER FOR RELIEF

WHEREFORE, Foundation Medicine respectfully requests the following relief:

    (a)    That Guardant take nothing by its Third Amended Complaint;

    (b)    That Guardant's claims for relief be dismissed with prejudice and each request for relief therein be denied;

    (c)    That a judgment be entered declaring that Foundation Medicine has not infringed and does not infringe, literally or by equivalents, any valid and enforceable claim of the '731, '822,'743, and '992 patents;

    (d)    That a judgment be entered declaring that the claims of the '731 , '822, '743, and '992  patents are invalid and/or unenforceable;

    (e)    

    (f)    That the Court determine that this is an exceptional case under 35 U.S.C. § 285 and award attorneys' fees, costs and other expenses to Foundation Medicine in this action; and

    (g)    That the Court award Foundation Medicine such other and further relief as the Court may deem just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Foundation Medicine demands a jury trial as to all matters triable of right by a jury.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*
Karen Jacobs (#2881)
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
kjacobs@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Foundation Medicine, Inc.*

OF COUNSEL:

Eric J. Marandett
G. Mark Edgarton
Sophie F. Wang
Diane Seol
John C. Calhoun
CHOATE HALL & STEWART LLP
Two International Place
Boston, MA  02110
(617) 248-5000

Matthew Wolf
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000

April 16, 2021